**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARROWBONE DEVELOPMENT
COMPANY,
Plaintiff-Appellant,

v.

No. 97-1642

DISTRICT 17, UNITED MINE
WORKERS OF AMERICA; LOCAL UNION
93, UNITED MINE WORKERS OF
AMERICA,
Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Robert J. Staker, Senior District Judge.
(CA-95-243-3)

Argued: December 3, 1997

Decided: June 8, 1998

Before NIEMEYER and WILLIAMS, Circuit Judges, and
JONES, United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Reversed by published opinion. Judge Niemeyer wrote the majority
opinion, in which Judge Williams joined. Judge Jones wrote a dissent-
ing opinion.

_____

**COUNSEL**

**ARGUED:** Ronald E. Meisburg, HEENAN, ALTHEN & ROLES,
Washington, D.C., for Appellant. Kevin F. Fagan, DISTRICT 17,

UMWA, Charleston, West Virginia, for Appellees. **ON BRIEF:** William I. Althen, HEENAN, ALTHEN & ROLES, Washington, D.C.; Donna C. Kelly, HEENAN, ALTHEN & ROLES, Charleston, West Virginia, for Appellant. Charles F. Donnelly, HOSTLER & DONNELLY, L.C., Charleston, West Virginia, for Appellees.

_____

**OPINION**

NIEMEYER, Circuit Judge:

The issue presented in this case is whether a national collective-bargaining agreement, which requires an employer to assign to employees of a local union work previously done by contractors, violates § 8(e) of the National Labor Relations Act (prohibiting agreements that require the employer to cease doing business with other persons). We hold that, despite the fact that the national union's members may have traditionally performed such work for other employers, the employees in the local bargaining unit did not perform such work, and application of the national agreement to the local unit would aggrandize the work of the unit in violation of § 8(e). We therefore reverse the judgment of the district court.

I

Since 1976, Marrowbone Development Company has been operating a coal mining complex in Mingo County, West Virginia. The complex consists of five separate mines and numerous support facilities, including a preparation plant, a warehouse, a repair facility, and other support units. To transport and deliver materials and supplies among the various facilities at its mining complex, Marrowbone has always engaged contractors or used its salaried employees.

In May 1993, pursuant to the organizing campaign of the United Mine Workers of America ("UMW" or "the Union") to represent non-supervisory employees at the mining complex for collective bargaining purposes, the National Labor Relations Board ("NLRB") conducted an election. The NLRB defined the potential bargaining unit as:

2

> All full-time and regular part-time production and mainte-
> nance employees employed by the Employer at its mines
> and preparation plant in Mingo County, West Virginia,
> excluding all office clerical employees, warehouse employ-
> ees, laboratory technicians and employees of contractors,
> and all professional employees, guards and supervisors as
> defined in the Act.

The Union won the election, and the NLRB certified Local 93, UMW, as the exclusive bargaining representative of Marrowbone's classified employees.

Pending the ratification of the National Bituminous Coal Wage Agreement, which the parties anticipated would take place later in 1993, Marrowbone and the Union entered into an interim agreement under which they agreed that all terms and conditions of employment at Marrowbone's mining complex would remain the same until the national agreement was ratified. The parties also agreed that, upon ratification, the national agreement would bind them. The interim agreement thus applied to Local 93 for the period from July 16, 1993 until December 16, 1993, at which time the national agreement was ratified.

The national agreement provided for particularized assignments of work. Article IA(a) of the agreement states that:

> The production of coal, including removal of overburden
> and coal waste, preparation, processing and cleaning of coal
> and transportation of coal (except by waterway or rail not
> owned by the Employer), repair and maintenance work nor-
> mally performed at the mine site or at a central shop of the
> Employer and maintenance of gob piles and mine roads, and
> work of the type customarily related to all of the above shall
> be performed by classified Employees of the Employer cov-
> ered by and in accordance with this Agreement . . . .

Article IA(c) of the agreement states that:

> Supervisory employees shall perform no classified work
> covered by this Agreement except in emergencies and

3

> except if such work is necessary for the purpose of training or instructing classified Employees . . . the burden is on the Employer to prove that classified work has not been performed by supervisory personnel.

And finally, Article XXVI(b) of the agreement states that:

> This Agreement supersedes all existing and previous contracts except as incorporated and carried forward herein by reference; and all local agreements, rules, regulations and customs heretofore established in conflict with this Agreement are hereby abolished.

In April 1994, four months after the national agreement became controlling, members of Local 93 filed grievances with Marrowbone, contending that Marrowbone was using nonunion employees to transport and deliver materials throughout the mining complex, in violation of the national agreement. One of these grievances addressed work performed by contractors and the others addressed work performed by salaried employees.

Because the parties were unable to resolve the grievances, they submitted their dispute to arbitration, as required by the national agreement. The arbitrator held that the agreement required Marrowbone to assign all transportation and delivery work to represented employees and accordingly ordered Marrowbone to "cease from utilizing exempt personnel or subcontractors from performing the disputed work; when done, such work is to be assigned to a classified employee."

Marrowbone thereafter filed this action in the district court to vacate the arbitrator's award, arguing that the agreement, as applied by the arbitrator, violated § 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e), and therefore was unenforceable against Marrowbone. On motions for summary judgment, the district court ruled that, as applied by the arbitrator, the contract did not violate § 8(e) because it operated to preserve work for the UMW and not to acquire it. To reach this conclusion, the court determined that the relative group of employees for comparison was other locals of the UMW. Since other locals had typically performed transportation and

4

delivery work at other mine sites, the court concluded that the clause as it operated in this case was a work-preservation clause and therefore did not violate § 8(e).

Marrowbone noticed this appeal, challenging only that part of the district court's ruling which requires Marrowbone to cease its customary relations with contractors.

II

At the outset, we must address the Union's contention that the courts are required to uphold the arbitrator's award in this case because the award "draws its essence" from the collective-bargaining agreement. See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36-38 (1987); Upshur Coals Corp. v. United Mine Workers of America, Dist. 31, 933 F.2d 225, 228-29 (4th Cir. 1991). While Marrowbone does not challenge the deference due arbitrator's awards and, indeed, does not challenge the arbitrator's interpretation of the collective-bargaining agreement itself, it argues that when this interpretation is applied against Marrowbone to reassign work, this application renders the contract unenforceable under§ 8(e) of the NLRA. The enforceability of contracts, it argues, is a legal question that goes to the arbitrator's power to act and therefore is for the courts and not the arbitrator to decide. Cf. Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 83-84, 86 (1982). The district court agreed with Marrowbone that the issue presented in this case is collateral to the arbitration challenge because Marrowbone is not attacking the arbitrator's report but rather the collective-bargaining agreement as applied. For the following reasons, we affirm this conclusion.

We begin with § 301 of the Labor Management Relations Act, which provides that suits for violation of collective-bargaining agreements may be filed in federal courts. See 29 U.S.C. § 185(a). It is well established that § 301 provides federal courts not only with jurisdiction but also with the duty of developing a federal common law of labor rights in connection with the enforcement of collective-bargaining agreements. See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 209 (1985); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456 (1957).

5

It is also well established that the obligation to arbitrate is a creature of contract and that a party cannot be required to submit to arbitration unless he has agreed to do so in a contract. See United Steelworkers of America v. Warrior & Gulf Navig. Co. , 363 U.S. 574, 582 (1960). Accordingly, the court decides, as issues of contract law, the threshold questions of whether a party is contractually bound to arbitrate and whether, if so bound, the arbitration provision's scope makes the issue in dispute arbitrable. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546-47 (1964). Thus,"[i]t [is] for the court, not the arbitrator, to decide in the first instance whether the dispute was to be resolved through arbitration." AT&T Techs., Inc. v. Communications Workers of America, 475 U.S. 643, 651 (1986).

A dispute committed by contract to arbitration is resolved essentially by the arbitrator and not the court. An arbitrator's award that "draws its essence" from the collective-bargaining agreement is accorded great deference and must be upheld. See Upshur, 933 F.2d at 228-29. But, while a court challenge to the merits of an arbitrable award faces a formidable burden, a challenge to the arbitrator's power to legally make the award presents a straightforward question of law for the court to decide.

As a corollary to the principle that the court decides issues of arbitrability, the court also decides questions about the legality of the underlying contract because such questions go to the basis of the arbitrator's power. See Kaiser Steel, 455 U.S. at 83 ("It is also well established, however, that a federal court has a duty to determine whether a [collective-bargaining] contract violates federal law before enforcing it."). As the Court noted in Kaiser Steel , a court, and not the National Labor Relations Board (or in our case, an arbitrator), must decide whether a collective-bargaining agreement violates § 8(e) before it can be enforced, because § 8(e) renders certain contracts "unenforcible [sic] and void." See  29 U.S.C. § 158(e). This is the type of question that courts decide and review de novo. See Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union , 76 F.3d 606, 608 (4th Cir. 1996); Island Creek Coal Co. v. District 28, United Mine Workers of America, 29 F.3d 126, 129 (4th Cir. 1994).

In this case, Marrowbone does not dispute that the collective-bargaining agreement requires it to cease using exempt employees in

6

the transportation and delivery of materials and supplies at its Mingo County complex. Rather, it argues that § 8(e) of the NLRA prohibits the agreement from having legal force to require such a cessation. Marrowbone's assertion thus goes to the authority of the arbitrator to legally make its award and to the ability of the courts to enforce that award under § 8(e). These are legal questions for the court that we review de novo.

III

On its § 8(e) claim, Marrowbone argues that because its nonsupervisory employees at the Mingo County complex have never done transportation and delivery work, to require them to do this work now would be "work-acquisitive" rather than "work-preservative" and would thereby constitute a "secondary" limitation, illegal under § 8(e) of the NLRA. The Union responds in two ways. It argues first that the relevant group of employees to consider, in determining by comparison whether the contract is work-acquisitive or work-preservative, is similarly-situated employees in other locals of the UMW. The Union argues that because these employees in other locals have long done such work, the national agreement does not illegally expand the work of the employees at the cost of third parties, but rather legally preserves the traditional work of UMW employees. Second, the Union argues that there is no evidence of illegal motive or secondary boycotting, and that when all circumstances are taken into account, it becomes clear that the work assignment clauses of the national agreement are not the sort prohibited by § 8(e).

In order to evaluate these competing claims, we must review the scope of § 8(e). Section 8(e) of the NLRA, which was added to the Act in 1959 as part of the Landrum-Griffin amendments, provides that:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into

7

> heretofore or hereafter containing such an agreement shall
> be to such extent unenforcible [sic] and void . . . .

29 U.S.C. § 158(e). The language of § 8(e) is broad, and taken at face value, it would appear to prohibit any agreement that forces an employer to cut off business dealings with an outside party. At the time of its passage, commentators wondered whether§ 8(e)'s broad language would operate to outlaw all clauses that place limitations on an employer's right to subcontract. See, e.g. , Benjamin Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv. L. Rev. 1086, 1118-19 (1960). The legislative history of § 8(e), however, makes clear that its purpose was not to prevent all subcontracting clauses, but rather to prohibit only those clauses that had the effect of creating secondary pressure on a bargaining situation. These clauses are commonly known as "hot cargo clauses," because unions initially used such clauses to limit the cargo that employees would handle. See, e.g., S. Rep. No. 86-187 (1959), reprinted in 1959 U.S.C.C.A.N. 2318, 2382-84; H.R. Rep. No. 86-741 (1959), reprinted in 1959 U.S.C.C.A.N. 2424, 2443-44, 2478-79, 2494-95; Conf. Rep. No. 86-1147 (1959), reprinted in 1959 U.S.C.C.A.N. 2503, 2510-12.

Traditionally understood, the problem with such secondary pressure is twofold. First, "the use of secondary pressure tends to enlarge the primary labor dispute between the union and the`unfair' employer by involving neutral employers in the controversy, thereby magnifying the disruptive effects of the altercation on the economy." David M. Ebel, Comment, Subcontracting Clauses and Section 8(e) of the National Labor Relations Act, 62 Mich. L. Rev. 1176, 1177 (1964) (footnote omitted); see also Brown v. Local No. 17, Amalgamated Lithographers of America, 180 F. Supp. 294, 297 (N.D. Cal. 1960). And second, it is generally perceived as inequitable for a union to be able to force a neutral party to exit a profitable relationship for reasons extrinsic to the employer's relationship with that party. See National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 624-627 (1967); S. Rep. No. 86-187 (1959), reprinted in 1959 U.S.C.C.A.N. 2318, 2382-84.

Because hot cargo clauses traditionally required an employer to cease doing business with another employer when a certain set of circumstances were met, they became a useful method of applying sec-

8

ondary pressure on employers. Before § 8(e) was passed, § 8(b) of the NLRA, 29 U.S.C. § 158(b), prohibited secondary boycotts of employers, but unions could effect the same results as a secondary boycott by forcing employers to include hot cargo clauses in their contracts with unions. Congress enacted § 8(e) to close this loophole in the law, and thereby eliminate secondary pressure in whatever form it might take. See H.R. Rep. No. 86-741 (1959), reprinted in 1959 U.S.C.C.A.N. 2424, 2478-79; National Woodwork , 386 U.S. at 634.

Understanding that the purpose of § 8(e) was to eliminate secondary pressure tactics, even when disguised as subcontracting clauses, the Supreme Court has crafted a test that helps to identify when a clause has secondary effects and when it is merely primary in nature. In National Woodwork, the Court held that where a union's objective in contracting for a subcontracting clause is to preserve the work of its members, and not to satisfy other union goals, such as to acquire new work, the clause does not violate § 8(e). 386 U.S. at 644-46. "The touchstone," the Court explained, "is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees." Id. at 645. Although the National Woodwork Court explicitly failed to decide "the questions which might arise where the workers carry on a boycott to reach out to monopolize jobs or acquire new job tasks when their own jobs are not threatened . . .," id. at 630-31, later Court decisions have indicated that where a union seeks to aggrandize its position through a subcontracting clause, the clause violates § 8(e). In NLRB v. International Longshoremen's Ass'n ("Longshoremen I"), 447 U.S. 490, 504 (1980), the Court explained that "[a]mong the primary purposes protected by the Act is `the purpose of preserving for the contracting employees themselves work traditionally done by them.'" It therefore noted that "a lawful work preservation agreement must pass two tests: First, it must have as its objective the preservation of work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question . . . ." Id. In making such an analysis, the Supreme Court has counseled that courts "must focus on the work of the bargaining unit employees, not on the work of other employees who may be doing the same or similar work." Id. at 507.

Thus, where a subcontracting clause is merely preservative of the work traditionally done by bargaining unit employees, it does not vio-

9

late § 8(e). But where a subcontracting clause acquires work not traditionally done by those employees, it amounts to an unlawful secondary boycott clause. See NLRB v. International Longshoremen's Ass'n ("Longshoremen II"), 473 U.S. 61, 79-80 n.19 (1985); Humphrey v. International Longshoremen's Ass'n, 548 F.2d 494, 497 (4th Cir. 1977).

With these principles in hand, we turn to the agreement before us to determine whether the application of the UMW's national agreement to Marrowbone's employees at the Mingo County complex is work-preservative or work-acquisitive. If it is work preservative, then we must uphold the arbitrator's award. If it is work acquisitive, then we must refuse to enforce it as violative of § 8(e).

To determine whether the agreement before us preserves or acquires work for the bargaining unit -- that is, whether the work at issue was traditionally done by the employees before the agreement -- we must determine which group of employees is the relevant group for comparison. Stated otherwise, in deciding whether a contract aims to acquire "new jobs," we need to know which employees to look at in determining what the "old jobs" are. Specifically, in the case of a newly formed local union, we must decide whether to compare the contract's work jurisdiction with the jobs historically done by the employees who are now members of the local, or with the jobs generally done by the union's other employees throughout all of its locals. If the employees of the newly-formed local are the group on which to focus, then the agreement acquires for them work which they traditionally have not performed, i.e., transportation and delivery of materials and supplies at the Marrowbone mining complex in Mingo County.

For the reasons that follow, we hold that the appropriate group for comparison is the group of employees constituting Local 93, and not the members of the UMW's other locals. Our conclusion best accords with general labor law principles and with the premises of § 8(e).

First, § 8(e) has as its basic premise that the goal of labor relations is to keep labor disputes within the bounds of the employer-employee relationship. Because a primary reason for preventing secondary boycotts is to keep individual labor disputes from spilling over into other

10

areas of the economy, § 8(e)'s prohibition on hot cargo clauses may in one sense be understood as expressing a congressional preference that only those employers and employees directly affected by the dispute should be involved in the bargaining process. To include the interests of persons beyond the dispute in the calculation of a dispute's terms would run contrary to Congress' desire to keep labor disputes confined to bargaining between particular employers and employees. Therefore, § 8(e) evinces a preference for comparing only the jobs of the particular employer's employees directly affected by the dispute, and not all job descriptions represented in all of a union's various locals.

Second, the local union's employees, not the national union's employees, are the beneficiaries of whatever work jurisdiction clauses they have arranged with their employer. The work conditions of employees in other UMW locals are by and large incidental to the negotiations and work situation at Marrowbone's complex. To include the job descriptions of non-Marrowbone employees in a determination of whether a clause is work-preservative or work-acquisitive would import into the analysis a range of work situations and job descriptions that have no relevance to the situation of Marrowbone employees or to the way the Marrowbone mines are operated. Thus, the employees at Marrowbone are the most appropriate actors in determining whether a contract with Marrowbone has altered employees' work jurisdiction at that complex.

And third, pragmatically, the union's suggestion that we consider all of the job descriptions represented by the national union would be an unmanageable task. National unions are composed of numerous locals, each with its own history of job relations and its own capacity to negotiate its work jurisdiction. If we were to consider other locals in our determination of what work is typically performed, we would be faced with the intractable questions of "what other locals?" and "what other work?" A national union could represent, for example, mine-workers, haberdashers, and truckers. Different local unions could negotiate different terms of employment with their respective employers. Using a national union's employees in other locals would require courts to choose which locals to compare and which terms to compare without any meaningful legal grounds on which to base that choice. We decline to undertake such a task.

11

Supreme Court dicta fortify our conclusions. In <u>National Woodwork</u>, the Court explained that § 8(e) does not prohibit agreements that are designed to require an employer to preserve for <u>its</u> employees the work "traditionally done <u>by them</u>." 386 U.S. at 635 (emphasis added). "The touchstone is whether the agreement or its maintenance is addressed to the labor relations <u>of the contracting employer</u> vis-a-vis <u>his own employees.</u>" <u>Id.</u> at 645 (emphasis added). Thus, regardless of whether the agreement is national in scope, in determining whether it preserves or acquires work, the analysis must focus on the work of the local employees and not those elsewhere. As the Supreme Court instructed in <u>Longshoremen I</u> :

> [T]he inquiry must be carefully focused: to determine whether an agreement seeks no more than to preserve the work of bargaining-unit members, <u>the Board must focus on the work of the bargaining unit employees</u>, not on the work of other employees who may be doing the same or similar work, and examine the relationship between the work as it existed before the innovation and as the agreement proposes to preserve it.

447 U.S. at 507 (emphasis added) (footnote omitted); <u>see also</u> <u>Longshoremen II</u>, 473 U.S. at 77-78.

The Union argues, however, that if only Local 93 employees are used as the basis for comparison, then new locals would never be able to form because any new local would need, by definition, to expand its work jurisdiction. The determination of § 8(e) claims, however, is a fact-bound endeavor. <u>See National Woodwork</u>, 386 U.S. at 644. In the case at hand, we are not faced with a new local formed at a worksite lacking employee history. Rather, the pool of employees out of which the local bargaining unit was formed has an individual work history, distinct from that of the newly-formed local and distinct from that of Marrowbone's contractors. Furthermore, the NLRB clearly defined the employees represented by the local in its direction of election. In such a circumstance, the baseline job descriptions of the local have a clear reference point. Moreover, Local 93 was formed in July 1993, and from July until December, its members did not perform transportation and delivery work. Only with the ratification of the

12

national agreement in December was Marrowbone required to assign that work to classified employees.

Thus, we find that, in the case at hand, Local 93 employees are the appropriate group to consult in comparing the new work with the old. Using the previous work of the members of the local bargaining unit, as well as the work of bargaining unit employees from July until December 1993, as the basis for comparison, we conclude that when the arbitrator applied the national agreement to force Marrowbone to cease its relationship with its contractors for transportation and delivery work, it applied the agreement in a work-acquisitive manner. The bargaining unit employees never engaged in delivery and transportation work before the enforcement date of the national agreement. The clauses in the national agreement that forced Marrowbone to turn over this work to union employees would therefore be an aggrandizement of the local employees' work. And because, in turning over such work to employees, Marrowbone was required to cease its business relations with other parties, the clauses are secondary in nature. The arbitrator's application of the national agreement is therefore contrary to the dictates of § 8(e).

Despite this fact, the Union argues that the national agreement, by its terms, supersedes any customs that may already exist at Marrowbone. Article XXVI(b) of the national agreement, it argues, explicitly states that the agreement abolishes all prior customs and rules. Section 8(e), however, applies not just to the parts of the national agreement that require the cessation of contractor work, but to the entire agreement as applied. Thus, even if Article XXVI(b) would operate to abolish the prior work situation at Marrowbone, because that abolition would be contrary to the dictates of § 8(e), we cannot give it legal force.

The Union further maintains that because Marrowbone has presented no evidence of any improper Union motive, the national agreement should not be interpreted to be work-acquisitive or secondary. Marrowbone, however, need not demonstrate that the Union had an illegal motive. Rather, it need only show that, under "all the surrounding circumstances," the agreement is work-acquisitive in nature. National Woodwork, 386 U.S. at 644. In a situation like the case before us, where a subcontracting clause forces an employer to cease

13

business relations with a contractor in a way that aggrandizes the local's work jurisdiction, that circumstance alone is sufficient to find that the agreement is secondary in effect and thus violative of § 8(e).

For the reasons given, we reverse the judgment of the district court insofar as it requires that Marrowbone cease using contractors for the transportation and delivery work traditionally performed for it by contractors.

REVERSED

JONES, District Judge, dissenting:

The collective bargaining agreement ("CBA") between Marrowbone and the Union contains a "work preservation" provision, which, as reasonably construed by an arbitrator, provides that Marrowbone will use only bargaining unit employees to transport and deliver materials and supplies within its Mingo County complex. The primary issue on appeal is whether the CBA, which indirectly prohibits Marrowbone from using the outside contractors it previously employed to do such work, is unenforceable under § 8(e) of the National Labor Relations Act. The majority holds that because the CBA's effect is to grant the local bargaining unit work it did not previously perform, the relevant clause does not "preserve" work for the Union, but is rather "work-acquisitive" and thus violative of § 8(e). However, just as clauses that preserve work the local bargaining unit has long performed are not necessarily lawful under § 8(e),[1] I do not believe that work acquisition clauses automatically violate § 8(e). In attempting to determine whether a contract provision violates§ 8(e), we should not rely solely on the distinction between work acquisition and work preservation, but should instead look at the totality of the circumstances

_____

[1] "[A]n agreement that reserves work for union members may also have an unlawful secondary objective. The preservation/acquisition dichotomy . . . can serve the useful purpose of aiding the inquiry regarding unlawful secondary objectives when an agreement attempts to secure work but `jobs are not threatened.'" NLRB v. Int'l Longshoremen's Ass'n., 473 U.S. 61, 79 n.19 (1985) (emphasis added) ("ILA II"). However, "[i]t must not be forgotten that the relevant inquiry . . . is whether a union's activity is primary or secondary." Id. at 81.

14

to determine if the provision in question was motivated by primary or secondary intent.**2** Accordingly, I dissent.

Admittedly, the language of § 8(e) is broad, and taken at face value, would appear to prohibit any agreement that requires an employer to cut off business dealings with an outside party. However, § 8(e) was intended to prohibit only those clauses that have the effect of creating secondary pressure on a bargaining situation. In its seminal opinion on the subject, the Supreme Court noted that "Congress meant §§ 8(e) and 8(b)(4)(B) to prohibit only `secondary' objectives." National Woodwork, 386 U.S. at 620. The Court has since further explained that "[t]he `touchstone' and `central theme' of § 8(e) is the protection of neutral employers . . . which are caught in the middle of a union's dispute with a third party." Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 84 (1982). Although little case law analyzes the limits of § 8(e), the Supreme Court opinions on point make clear that § 8(e) was enacted because Congress did not want a dispute between a single business and its employees to draw neutral outside parties into its ambit.

_____

**2** The NLRB's standard for determining if a contract clause violates § 8(e) is that "[c]ontract provisions are secondary and unlawful if they are to have as their principal objective the regulation of the labor policies of other employers and not the protection of the unit." General Truck Drivers, Local Union 957, 298 N.L.R.B. 395, 399 (1990) (quoting Retail Clerks Int'l Ass'n, Local Union 1288, 163 N.L.R.B. 817, 819 (1967)). See also National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 635-636 (1967) ("Although the language of § 8(e) is sweeping, . . . the legislative history . . . consistently defined the evil to be prevented in terms of agreements which obligated neutral employers not to do business with other employers involved in labor disputes with the union.").

The Third Circuit put it well when it explained that "[i]f the purpose is to benefit the employees of the bargaining unit, the agreement is `primary' and does not run afoul of § 8(e). If, however, the aim is to put pressure on an outside employer to submit to union objectives, the provision is secondary and prohibited. . . . So long as the union has no forbidden secondary purpose to affect the employment relations of an outside employer, the agreement is valid even though it adversely affects the employment opportunities of non-represented workers." In Re Bituminous Coal Wage Agreements, 756 F.2d 284, 289 (3d Cir. 1984).

15

The Supreme Court has set forth general formulations to aid courts in determining when a clause has secondary effects and when it is primary in nature. In National Woodwork, the Court held that because the union's goal in that case was to preserve work traditionally performed by union laborers, the clause at issue was primary in nature and did not violate § 8(e). 386 U.S. at 644-46. More than a decade later, in NLRB v. International Longshoremen's Ass'n, 447 U.S. 490, 504 (1980) ("ILA I"), the Court held that courts must not only seek to determine whether the agreement's effect is to preserve work, but also whether its intent or objective is to preserve work.[3]

Where a clause meets the ILA I test and is found to have the primary objective of seeking to preserve work traditionally done by the union, the clause generally does not violate § 8(e). However, the Supreme Court has never held that a clause seeking to acquire new work for union employees necessarily violates § 8(e).[4] Rather, the Court has stated that "[t]he touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees." National Woodwork, 386 U.S. at 645.

The majority holds that this case turns on whether the CBA's clause was work-preservative or work-acquisitive. [5] Further, the

_____

[3] The Third Circuit has held that to find a contract clause invalid under § 8(e), a court must find that it has both a secondary purpose and a secondary effect. In Re Bituminous Coal, 756 F.2d at 290. The Supreme Court's holdings are consistent with this view. For example, the Court has held that a work preservation clause is not valid per se, but rather fails to provide a union with an adequate defense to an § 8(e) charge -- even if the work "preserved" was traditionally performed by the union -- if one of the union's objectives is really to influence the employer by exerting pressure on a third party, such as a subcontractor. See NLRB v. Enterprise Ass'n of Steam Pipefitters, 429 U.S. 507 (1977).

[4] The Supreme Court specifically reserved that question, noting that while work preservation was a protected primary motivation, it might be different if a union sought to "monopolize jobs or acquire new job tasks when their own jobs [were] not threatened." National Woodwork, 386 U.S. at 630-31; NLRB v. Enterprise Ass'n of Steam Pipefitters, 429 U.S. at 528 n.16 (majority) and 537 n.2 (dissent).

[5] Because the parties have focused on the question of whether the Union is preserving or acquiring work, a primary issue has been whether

majority concludes that "Marrowbone . . . need not demonstrate that the Union had an illegal motive. Rather, it need only show that, under `all the surrounding circumstances,' the agreement is work-acquisitive in nature." In my opinion, this analysis incorrectly replaces the Supreme Court's primary query in National Woodwork, whether a clause is primary or secondary, with a derivative inquiry, whether a clause is work preservative or work acquisitive.

As the Supreme Court has recognized, "[t]he various linguistic formulae and evidentiary mechanisms we have employed to describe the primary/secondary distinction are not talismanic nor can they substitute for analysis." ILA II, 473 U.S. at 81. Rather, cases require an inferential, fact-intensive inquiry. Id. While the fact that a clause is work acquisitive is a relevant factor to consider when analyzing whether the clause is primary or secondary, the preservation/acquisition distinction is only one of several factors to consider.

The party who challenges a contract provision has the burden of proving that the provision in question was motivated by unlawful, secondary intent and thus violates § 8(e). Looking at the case at hand, I find that Marrowbone has failed to show that the clause at issue had any secondary purpose. Again, "[c]ontract provisions are secondary and unlawful if they . . . have as their principal objective the regulation of the labor policies of other employers and not the protection of the unit." General Truck Drivers, 298 N.L.R.B. at 399 (quoting Retail Clerks, 163 N.L.R.B. at 819). Even if a contract provision increases the number of union jobs, "[a]bsent some additional showing of an attempt `to reach out to monopolize jobs,' such an agreement is lawful." ILA II, 473 U.S. at 79 (quoting National Woodwork, 386 U.S. at 630).

_____

we should consider the work that was previously done by the specific local bargaining unit, or the work traditionally done by similar units across the nation in order to decide if work is being preserved or acquired. Although the district court held that it should consider the past work practices of other local bargaining units, I find the majority's analysis of this issue more persuasive. Nonetheless, I do not believe that this determination ends our inquiry.

17

There is no evidence in this case that suggests the Union negotiated this provision to target neutral employers or coerce customers. Rather, the totality of the circumstances that can be gleaned from the record[6] indicates that a newly-formed local bargaining unit had only its own members' interests at heart when it negotiated a provision that would reserve transport jobs for Marrowbone employees.

Determining § 8(e) claims is a fact-bound endeavor, and the totality of surrounding circumstances must be examined to determine whether a union's objective was primary in nature, or whether an agreement was "tactically calculated to satisfy union objectives elsewhere." National Woodwork, 386 U.S. at 644; ILA I , 447 U.S. at 504 (court must look at "all the surrounding circumstances" to decide if Union's objective is primary or secondary). The totality of circumstances to consider in determining whether a union had primary or secondary motivation includes the "history of labor relations between the union and the employers . . . and the economic personality of the industry." National Woodwork, 386 U.S. at 645 n.38. It seems also relevant to consider the history and strength of a particular union when attempting to distinguish between the union which seeks only to advance its members' economic interests and the union which seeks to aggrandize power with which to coerce neutral third parties.

The district court considered the history between the parties, as well as the parties' actions and motivations, and after reviewing the totality of circumstances, held that this case contained no indicia of improper secondary Union motivations. Instead, it found that the provision was negotiated by a fledgling local bargaining unit solely to advance its own workers' interests and that the provision was "addressed to the labor relations of the contracting employer vis-a-vis [its] own employees." ILA I, 447 U.S. at 504. Marrowbone has not identified any evidence contradicting these findings and has failed to demonstrate that the provision at issue was the result of any improper secondary motivations.

For these reasons, I respectfully dissent.

_____

[6] The case was decided by the district court on a joint stipulation of undisputed material facts.