*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CV-1156

WASHINGTON TEACHERS' UNION, APPELLANT,

v.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-2140-17)

(Hon. Florence Y. Pan, Trial Judge)

(Argued March 13, 2019                                    Decided May 16, 2019)

*Daniel M. Rosenthal*, with whom *Lee W. Jackson* and *Alice C. Hwang* were on the brief, for appellant.

*Mark J. Murphy* was on the brief for Teamsters Local Union No. 639 *Amicus Curiae*, in support of Washington Teachers' Union, appellant.

*Holly M. Johnson*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Stacy L. Anderson*, Acting Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Before FISHER and BECKWITH, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*: This case tees up, for the first time, the question

whether the court, or an arbitrator, has the initial responsibility to determine

whether a "class action/group grievance" filed by a union against a public employer is arbitrable. In September 2015, the Washington Teachers' Union (WTU) filed such a grievance under its collective bargaining agreement (CBA) with the District of Columbia Public Schools (DCPS). In pursuing the group grievance, WTU was purporting to represent "over 180" teachers who had "received less than Effective ratings" under the "IMPACT" evaluation process. These teachers were placed on different levels of probation, and some even lost their jobs. Thus, the union — citing thirty-two examples of "unfair, arbitrary and capricious implementation and application" of IMPACT — sought arbitration from the American Arbitration Association (AAA) to rescind the "negative consequences" of those evaluations, including "restoration of all lost salaries, benefits[,] and privileges of employment." Upon motion by DCPS, the trial court permanently stayed arbitration, concluding that: (1) CBA Article 6.4.3.7 authorizes the filing of a "group grievance"; (2) the requested scope of arbitration, however, was too broad, even for a "group grievance"; (3) the union had not obtained the required "consent of the individual grievants" in the group "before proceeding on their behalf"; (4) the union, in effect, was challenging individual "evaluation judgments under the IMPACT process" which *WTU 1*,[1] a controlling

---

[1] *Wash. Teachers' Union v. District of Columbia Pub. Schs.*, 77 A.3d 441 (D.C. 2013) (hereafter *WTU 1*).

decision of this court, forbids; and (5) WTU's challenge reflected "a lack of good faith."

We agree with the trial court that the CBA authorizes a "group grievance" under CBA Article 6.4.3.7,[2] and that the scope of the requested arbitration was too broad for "a matter of general application" under that Article — a decision for the court, not the arbitrator, to make. Accordingly, we affirm the trial court's order staying arbitration. Our ruling, however, is without prejudice to WTU's reformulating its group grievance, consistent with this opinion, for submission to arbitration under the CBA. All other issues raised in this case would be for an arbitrator to decide, as arbitrators have broad discretion to address the merits of an issue pursuant to the parties' agreement and to craft remedies.[3]

---

[2] CBA Article 6.4.3.7 provides, "When a grievance is raised and involves a matter of general application, the initial step shall be Step 2."

[3] AMERICAN BAR ASSOCIATION COMMITTEE ON ADR IN LABOR AND EMPLOYMENT LAW – SECTION OF LABOR AND EMPLOYMENT LAW, DISCIPLINE AND DISCHARGE IN ARBITRATION 13-3 (Norman Brand & Melissa H. Biren eds., 3d ed. 2015).

## I. Facts and Proceedings

The CBA covers a universe of topics, including the opportunity for teachers to seek redress for alleged grievances.[4] The grievance process is organized into three steps. Step 1[5] authorizes a teacher to file a grievance on a form developed by WTU, followed by a meeting between teacher and principal. If that meeting fails to resolve the grievance, the parties will meet with the Instructional Superintendent and, if necessary, with the DCPS Office of Labor Management and Employee Relations, followed, if desired, by mediation.

If Step 1 fails, Step 2[6] commences with a hearing before a neutral hearing officer at which the parties have the opportunity to present evidence, including witnesses. The hearing officer's decision is binding unless a party requests

---

[4] A grievance is defined as "a complaint involving a work situation or a complaint that there has been a deviation from, misinterpretation of, or misapplication of a practice or policy; or a complaint that there has been a violation, misinterpretation, or misapplication of any provision of this Agreement." CBA Article 6.2.1.

[5] CBA Article 6.4.1.

[6] CBA Article 6.4.2.

arbitration — Step 3[7] — by filing a notice with the AAA. The CBA specifies the types of issues that may be submitted to arbitration, including issues with the IMPACT evaluation process.[8] According to CBA Article 15.3, "DCPS's compliance with the evaluation process, and not the evaluation judgment, shall be subject to the grievance and arbitration procedure."[9] In other words, the evaluator's particular actions, or failures to act, in rating a teacher can be challenged, but not the evaluator's rating or "judgment" at the end of that process. By analogy, the teacher's final "score" cannot be removed or adjusted by the arbitrator.

On September 3, 2015, WTU notified DCPS with a letter to the DCPS Chancellor invoking a Step 2 "class action/group grievance"[10] on behalf of "all ET-15 and EG-09 educators who received less than Effective ratings" derived from at least thirty-two violations of the IMPACT process during the 2014-15 school

---

[7] CBA Article 6.4.3.

[8] DCPS began using IMPACT as a teacher evaluation tool during the 2009-2010 school year.

[9] *See WTU 1*, 77 A.3d at 458 (According to CBA Article 15.3, "alleged violations of the IMPACT process are an appropriate subject for grievance and arbitration." However, "the arbitrator cannot rescind or amend a final evaluation, i.e., an 'evaluation judgment.'")

[10] See *supra* note 2 and accompanying text.

year (set forth verbatim in the Appendix to this opinion). In its grievance letter, WTU also alleged, without further specificity, violations of CBA Articles 2, 7, 10, 11, 15, 23, 24, as well as due process and No Child Left Behind Act violations. As to remedy, the union "requested that the rating[11] and any subsequent termination or negative consequences be rescinded and all related documents be expunged[,]" coupled with "restoration of all lost salaries, benefits and privileges of employment" so that union members are "made whole."

On October 8, 2015, DCPS denied WTU's grievance. The principal reasons for denying what DCPS referred to as a "kitchen sink approach" were: (1) WTU's failure "to allege a single fact applicable to the entire group of over 180 named grievants";[12] (2) WTU's failure "to obtain each named individual's consent before filing the instant grievance";[13] and (3) WTU's inclusion of claims that "were not

---

[11]   The request for rescission of a teacher's "rating" was omitted from DCPS's later request for arbitration, presumably because of our ruling in *WTU 1*. See *supra* note 9 and *infra* note 15.

[12]   See *supra* note 2.

[13]   CBA Article 6.3.1 provides: "Either an employee or the WTU may raise a grievance, and, if raised by the employee, the WTU may associate itself with the grievance at any time except as otherwise provided. . . . Any grievance raised by the WTU on behalf of an employee must identify the employee. The WTU may not process a grievance on behalf of an employee without the employee's consent."

subject to the grievance or arbitration process," in particular its effort to "challenge evaluator judgments[,] which are not subject to the grievance procedure."[14]

On June 13, 2016, following DCPS's denial of its grievance, WTU submitted its demand for arbitration to the AAA. For relief, WTU sought to reverse "all negative employment consequences" for the employees affected,[15] without rescission of teacher "ratings" or "evaluation judgments."[16]

---

[14] See *supra* note 9 and accompanying text.

[15] The WTU asked in full: "That any and all educators/teachers who were terminated and/or who suffered negative employment consequences, who received less than "Effective" Final IMPACT Ratings, in cases where DCPS violated the IMPACT Process for the 2014-2015 School Year, be reinstated to the teaching position from which she or he was terminated to a date prior to the effective date of his/her discharge; that any and all negative employment consequences of the Final IMPACT Ratings for School Year 2014-2015 be eradicated; that the Grievants be made whole for any and all lost salary, benefits, entitlements, and privileges of employment caused by DCPS'[s] imposition of a Final IMPACT Rating less tha[n] "Effective" where DCPS violated the IMPACT evaluation process; that the Class and Individual Grievants' 2014-2015 Final IMPACT Rating be without consequences for the 2014-2015 School Year and thereafter, and that neither the employment nor the compensation of those educators/teachers will be affected by their 2014-2015 Final IMPACT Rating; [that] the Grievants' personnel files/records be purged of any references to DCPS'[s] wrongful termination of, or imposition of negative employment consequences upon the Grievant; and finally, for an award of all costs and attorney's fees associated with the prosecution of this Grievance."

[16] See *supra* notes 9 and 11.

On October 31, 2016, DCPS demanded that WTU withdraw its demand for arbitration. Because AAA rules require arbitration to proceed absent a court order staying the arbitration, DCPS filed a motion in Superior Court on March 29, 2017, for a permanent stay. It argued, first, that the CBA does not permit arbitration regarding "IMPACT evaluation judgments."[17] DCPS emphasized this court's ruling in *WTU 1* that CBA "Section 15.3 plainly states that the 'evaluation judgment' is not 'subject to arbitration," although an arbitrator may address grievances challenging the "evaluation process." Second, DCPS asserted that DCPS and WTU had not agreed to submit this dispute to arbitration. It stressed that, contrary to CBA Article 6.4.3.7 limiting a group grievance to "a matter of general application,"[18] WTU had "failed to allege a single fact applicable to the entire group of over 180 named grievants."

On April 28, 2017, WTU filed its Opposition to the stay motion. WTU averred that its grievance focused exclusively on the IMPACT process and thus was subject to arbitration. In seeking to eliminate negative consequences associated with IMPACT ratings, WTU argued that it was not attempting to arbitrate the ratings themselves. WTU also asserted, more fundamentally, that the

---

[17] But see *supra* note 11.

[18] See *supra* note 2.

arbitrator, not the court, should decide whether any of the grievance issues was "inarbitrable." WTU explained that it viewed compliance with the CBA grievance process as entirely a "procedural issue,"[19] and thus that the arbitrator was entitled to address it.

The trial court held a hearing on July 5, 2017, to address the DCPS stay motion. At the hearing, the court said:

> [I]t seems to me that everybody agrees in principle that if these are process violations those are arbitrable. But why

---

[19] The courts have established a fundamental dichotomy to govern legal analysis of challenged arbitrations. "[T]hreshold or gateway issues," sometimes called "substantive questions," concern "whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy" — generally questions answered by a court in determining whether all parties have consented to the arbitration. *Catamaran Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 970 (8th Cir. 2017) (internal quotation marks omitted). Other questions that arise during an arbitration controversy "are procedural or subsidiary questions that courts presume an arbitrator may decide . . . once the obligation to arbitrate a matter is established. . . . These are questions for an arbitrator both because the parties would most likely expect an arbitrator to decide them . . . and because they do not challenge the arbitrator's underlying authority." *Id.* (internal citations omitted). *Accord*, *Del Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 873 (4th Cir. 2016) ("Procedural questions arise once the obligation to arbitrate a matter is established, and may include such issues as the application of statutes of limitations, notice requirements, laches, and estoppel. . . . Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, procedural questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.") (internal quotation marks omitted).

> is the union allowed to [] do a "kitchen sink" grievance and force the [c]ourt and the arbitrator to try to pick and choose what is arbitrable and what is not?  Why wouldn't the proper remedy be to stay the whole thing and you've got to file a grievance that complies with the collective bargaining agreement?

In elaborating on this "kitchen sink" concern, the court added, "I don't see that the [] District of Columbia Public Schools agreed that class matters that don't have a common thread can go to the arbitrator."  WTU then reiterated that it thought "there's been . . . process violations for all of them and that's why we're grieving them together."  In response, the court explained:  "[I]t just doesn't make any sense to bring it as a group grievance if there's no matter of general application.  Then it's like 180 individual grievances, some of which might have a couple things in common, but it doesn't really make a lot of sense to force an arbitrator to look at that."

In its order issued on September 5, 2017, the trial court granted DCPS's motion to permanently stay the arbitration.  The court was "persuaded that the group grievance filed by the Union is not arbitrable because DCPS did not consent to submitting this type of 'kitchen-sink' grievance to arbitration.  To the extent that the Union is challenging procedures under the IMPACT process, it is not doing so in a way that the CBA contemplates."  Even though the remedy that WTU was

seeking was not phrased as a challenge to the evaluation judgments themselves, the court concluded that WTU's "carefully worded" phrasing was nonetheless "aimed" at challenging such judgments, as forbidden by *WTU 1*: "The remedies sought by the Union in its demand for arbitration include reinstating fired teachers, restoring all compensation and benefits, and purging any references to the evaluation judgments from employment records.[20]  These remedies, taken together, are tantamount to eliminating or rescinding the ratings themselves."[21]

WTU filed its notice of appeal[22] on October 5, 2017.

_____

[20]  See *supra* note 15.

[21]  The amicus brief submitted by Teamsters Local Union No. 639 in support of WTU states, to the contrary, that DCPS has awarded this type of relief in its dealings with the union:

> Teamsters 639 has also negotiated settlement agreements with DCPS concerning IMPACT terminations that have included reinstatement, back pay and an understanding that the "ineffective" IMPACT termination would not be used against the bargaining unit member as part of future discipline.  During the processing of IMPACT termination grievances DCPS did not suggest to Teamsters 639 that such remedies were inappropriate or not available.

[22]  Pursuant to a March 2, 2018, order, a related appeal addressing a dispute between these two parties, 18-CV-0109, is stayed pending the court's resolution of this appeal.

## II. The Issues

The fundamental question presented is the extent to which this court may lawfully determine whether the "class/group grievance" at issue here is arbitrable. To answer, we must address the following issues:

1. As a matter of law, does the court or an arbitrator determine whether an alleged "class/group grievance" is arbitrable under the CBA?

2. If the appropriate authority determines that a "class/group grievance" is arbitrable under the CBA, does the same authority define its proper scope?

3. Once the appropriate authority has determined the proper scope of a "class/group grievance" under the CBA, which authority, court or arbitrator, lawfully determines whether the "class/group grievance" is arbitrable in this case?[23]

---

[23] DCPS raised other subsidiary issues: whether the CBA requires each teacher in the group to "consent" to arbitration; whether the CBA authorized WTU's limitation of group grievants to the subclass of educators most adversely affected by procedural defects; whether the court or an arbitrator should grant relief, if any; and whether WTU alleged its class/group grievance in good faith. None of these is at issue on appeal.

## III. Analysis

A. *As a matter of law, does the court or an arbitrator determine whether a "class/group grievance" is arbitrable under the CBA?*

As to the first issue, D.C. Code § 16-4406(b) (2012 Repl.) provides: "The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."[24] We conclude, accordingly, that the court,

---

[24] We elaborated upon this provision in *WTU 1*, 77 A.3d at 446 (internal quotation marks omitted):

> The question of whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate is for a court to decide, D.C. Code §16-4406 (b), but the arbitrator is given the authority under the [Arbitration] Act to decide other questions, such as whether a condition precedent to arbitrability has been fulfilled . . . . D.C. Code §16-4406(c). This division of authority between the court and the arbitrator stems from the principle that arbitrators derive their authority from the consent of the parties, as expressed through their agreement to arbitrate. Because a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit, the question of whether a particular dispute is subject to arbitration is reserved for the court to decide.

The statutory dichotomy in D.C. Code §§ 16-4406(b) and (c) reflects a nearly uniform body of case law assigning determination of arbitrability to the court. *See*

(continued . . . )

not an arbitrator, must determine whether WTU may pursue arbitration of a "class/group grievance" against DCPS under the CBA. Pursuant to this authority, we further conclude, as did the trial court — contrary to WTU's lead argument[25]

_____

( . . . continued)

*e.g.*, *Catamaran Corp.*, 864 F.3d at 970; *Del Webb Cmtys.*, 817 F.3d at 873-74; *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 331-32 (3d Cir. 2014); *Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594, 597-98 (6th Cir. 2013). A Supreme Court plurality once concluded that, under the terms of a broad arbitration agreement, "the question — whether the agreement forbids class arbitration — is for the arbitrator to decide." *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 451 (2003). However, in *Stolt-Nielsen S.A. v AnimalFeeds Int'l Corp.*, 559 U.S. 662, 680 (2010), the Court observed that "the parties appear to have believed that the judgment in *Bazzle* requires an arbitrator, not a court, to decide whether a contract permits class arbitration. . . . In fact, however, only the plurality decided that question." Recently, the Supreme Court reiterated that this determination of arbitrability remains an open question. *Lamps Plus, Inc. v. Varela*, 587 U.S. ___ (2019), slip op. at 8 ("This Court has not decided whether the availability of class arbitration is a so-called question of arbitrability, which includes these gateway matters.") (internal quotation marks omitted).

[25] WTU initially suggests that Article 6.4.3.7 is a mere procedural rule authorizing commencement of a "matter of general application" pursuant to Step 2 of the grievance process; it is not a "substantive prohibition on grievances that fail to allege an issue of general application." Furthermore, says WTU, CBA Article 15.6 authorizes any grievant — individual or group — to "commence a grievance at Step 2" without limitation to matters of general application. It follows, argues WTU, that the union can commence a class/group Step 2 grievance unconstrained by any limitation to a matter of general application. WTU, however, does not attempt to justify its threshold, unelaborated legal premise that Article 6.4.3.7 is not a substantive provision limiting the scope of group arbitration; it would leave that determination to the arbitrator. But as explained below in section III.B., interpretation of Article 6.4.3.7 is for the court, not the arbitrator, to decide, and we do not read that Article to express the limited, "procedural" understanding that WTU gives it.

— that CBA Article 6.4.3.7[26] is the only CBA source authorizing arbitration of a "class/group grievance."[27] The parties are at odds, however, as to what a grievance based on a "matter of general application" means — a substantive[28] delimitation in Article 6.4.3.7 not further defined in the CBA.

B. *If the appropriate authority determines that a "group grievance" is arbitrable under the CBA, does the same authority define its proper scope?*

This brings us to the second issue: does the court or an arbitrator define "matter of general application"? Put more specifically, once the court has

---

[26] See *supra* note 2.

[27] In its letter of September 3, 2015, to DCPS "invok[ing] this Step 2 grievance" and the CBA's "arbitration procedures," WTU characterized its claim as a "class action/group grievance," later expressed as a "class/group grievance." WTU has not claimed at any point in this litigation — in its pleadings or in oral argument before the trial court (or this court) — that a collective grievance under CBA Article 6.4.3.7 is tantamount to a class action under Super. Ct. Civ. R. 23(a)("prerequisites") and (b)("types"). Indeed, the language of Article 6.4.3.7, while in kindred spirit with a rule-based class action, is not found in Rule 23. Perhaps to underscore the difference, DCPS, in its pleadings, has limited its description of the union's demand to a "group grievance," a shortened form of the demand accepted by the trial court and not challenged by WTU. Recently, the Supreme Court cautioned that "courts may not infer consent to participate in class arbitration absent an affirmative contractual basis for concluding that the party *agreed* to do so." *Lamps Plus, Inc.*, slip op. at 8 (internal question marks omitted). Accordingly, absent a reference to "class" in CBA Article 6.4.3.7, we refer to "group grievance" in the balance of this opinion.

[28] See *supra* note 19.

concluded that a group grievance is arbitrable under CBA Article 6.4.3.7, which decision-maker determines the permitted scope of that arbitration — its outside limit on the arbitrator's authority to decide the case? Is that authority inherent in the court's threshold (commonly called a "gateway" or "substantive") determination of arbitrability, or is it a distinct "procedural" decision traditionally left to the arbitrator?[29]

The U.S. Court of Appeals for the Fourth Circuit has applied a contractual analysis to justify the court's — not an arbitrator's — authority to define the scope of an arbitration agreement. In a case considering whether the agreement had delegated to the arbitrator the authority to determine whether the matter at issue was arbitrable, the court concluded that "the parties did not intend to commit the very issue of the scope of arbitrability itself to arbitration."[30] A few years later, the Fourth Circuit reconfirmed that ruling.[31]

---

[29] See *supra* note 19.

[30] *Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 117 (4th Cir. 1993).

[31] *See Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.*, 147 F.3d 296, 300 (4th Cir. 1998) ("The court decides, as issues of contract law, the threshold questions of whether a party is contractually bound to arbitrate and whether, if so bound, the arbitration provision's scope makes the issue in dispute arbitrable."); *see also Rent-a-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69

(continued . . . )

There is no obvious reason, however, why an arbitrator, confronted by a group grievance permitted by a collective bargaining agreement, would be ill equipped to define the scope of that grievance provision. On the other hand, the very existence and application of a provision permitting arbitration of a group grievance under a collective bargaining agreement depend on the definition of that provision. Moreover, its definition cannot vary from case to case; it must be defined by the same organizing principle. A consistent, unchallengeable definition of the scope of arbitration is necessarily inherent in the court's decision whether a matter is arbitrable. Otherwise, based on arbitrators' varying ideas about what a "matter of general application" should mean, there would be enhanced risk of disturbingly inconsistent arbitrations affecting large numbers of teachers[32] or

_____

( . . . continued)

(2010) ("We have recognized the parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.").

[32] "Defendants are willing to accept the costs of . . . errors in [bilateral] arbitration [resulting from a lack of multilayered review] since their impact is limited to the size of individual disputes, and presumably outweighed by the savings from avoiding the courts." *AT&T Mobility LLC, v. Concepcion*, 563 U.S. 333, 350 (2011). Such a tradeoff, however, may not be worthwhile when an arbitrator is performing a class arbitration, for "when damages allegedly owed to [many] claimants are aggregated and decided at once, the risk of an error will often become unacceptable. Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims." *Id.*

imposing excessive costs on the school system.[33]   Accordingly, we conclude that, of necessity, the court must define what a "matter of general application means" when determining whether a matter, depending on that language, is arbitrable. Contrary to WTU's assertion, this is not merely a "procedural" determination.

To avoid fundamentally incompatible results, this court must therefore answer a second question: at what level of generality should "matter of general application" be defined, given no elaboration of its meaning in the CBA?  To say simply that the "matter" covers all complaints of employees who are "similarly situated," for example, or all grievances that have a "common thread," as the trial court found wanting here, would seem far too general.

As expressed at oral argument, WTU contends that a group grievance alleging a "matter of general application" embraces a "commonality" defined merely as an IMPACT "process violation."  This definition thus includes all thirty-

---

[33] Parties often agree to submit disputes to bilateral arbitration because of its informality, resulting in "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *AT&T Mobility LLC*, 563 U.S. at 348.  In contrast, group or class arbitration "makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.*  Thus, courts will not infer consent to class arbitration without a clear contractual basis for determining that the parties agreed to address their disputes in this manner. *Lamps Plus, Inc.*, slip op. at 12.

two alleged violations, reflecting a substantial variety of alleged evaluation lapses, to the detriment of "over 180 teachers," including an indefinite number not identified in the pleadings.[34] DCPS, to the contrary, would limit the definition to a "common injury" to each individual grievant in the alleged group, meaning an injury caused by the same kind of alleged IMPACT violation. DCPS added that "WTU failed to allege a single fact applicable to the entire group of over 180 named grievants," thereby implying that even if WTU's alleged group of grievants could be divided into subgroups characterized by common injuries, WTU would have to begin anew by allocating individual grievants to a very large number of subgroups for separate arbitrations.

In addressing the chasm between these two definitions, we note *first* that CBA Article 6.3.1[35] provides that "[a]ny grievance raised by the WTU on behalf of

---

[34] As stated in the grievance letter of September 3, 2015, sent by WTU to DCPS, the "class/group" is defined as follows: "all ET-15 and EG-09 educators who received less than Effective ratings in the WTU bargaining unit who had violations, misinterpretation, and misapplication of policy and provisions of the CBA and procedural violations under of the IMPACT process during the 2014-15 school year in DCPS, *whether or not their name appears on WTU/DCPS generated lists*." (Emphasis added.)

[35] But see *supra* note 13.

an employee must identify the employee." Thus, contrary to WTU's assertion,[36] the "class" or "group" authorized to proceed is limited to teachers named in the pleadings.

*Second*, we cannot agree with WTU that sufficient commonality for "a matter of general application" can be achieved by bundling together a variety of injuries caused by multiple violations of the IMPACT process. That would permit arbitration of a single claim that not even our class action rules, if applicable, would permit.[37] We agree with DCPS that a grievant's "injury" is the essential commonality required for a group arbitration (without further limitation by reference to the evaluator who may have caused it). Moreover, by "injury" we mean the specific process violation itself — the evaluator's alleged lapse — not the particular consequences of that evaluation (e.g., probation, demotion, termination, loss of salary). Those consequences will vary among persons who may have been injured by a common lapse, but who will ask for varying remedies crafted by the arbitrator,[38] depending on their individual situations. Our decision in *WTU I* essentially prescribed this "process" commonality for defining "injury" when we

---

[36] See *supra* note 34.

[37] See *supra* note 27.

[38] *WTU I*, 77 A.3d at 458.

stated that "alleged violations of the IMPACT process are an appropriate subject for grievance and arbitration."[39]

*Third*, according to CBA Article 6.4.3.3, "[t]he arbitrator may hear and decide only one grievance in each case," meaning that a group reflecting one type of injury cannot be joined with arbitration of another type of injury.

In sum, a "matter of general application," as applied here, is a "group grievance" defined by reference to injuries that the individual grievants have in common. Otherwise, we can discern no limiting principle that could justify a collective definition short of all "process violations," as proposed by WTU — a definition that would permit an agglomeration of instances far too unwieldy for compliance with CBA Article 6.4.3.3, which limits arbitration — including group grievance arbitration — to only "one grievance in each case."

    C. *Once the appropriate authority has determined the proper scope of a "group grievance" under the CBA, which authority, court or arbitrator, lawfully determines whether the "group grievance" is arbitrable in this case?*

---

[39] See *supra* note 9.

This brings us, finally, to the third issue: should this court, or an arbitrator, determine whether WTU may pursue arbitration of this particular "group grievance" brought against DCPS?[40]

If we were to shift resolution of this group grievance to an arbitrator, we would be engaging in a useless, time-wasting act. The trial court aptly characterized the thirty-two alleged violations of IMPACT asserted by WTU as a "kitchen-sink" group of grievances, applicable without specification to more than "180 grievants."[41] Thus, WTU has alleged a potpourri of grievances, not expressly tied to particular individuals, creating an alleged group grievance far broader than the words "matter of general application" could possibly accommodate under the "common injury" test for commonality. As a matter of law, no arbitrator could rationally conclude that the collection of grievances presented here by WTU could be structured as "a matter of general application" arbitrable, as required, in a single case.[42] For future cases, however, a substantive determination — the arbitral scope — has now been established as the platform from which an arbitrator may address

---

[40] See *supra* note 34.

[41] See *supra* note 34 and accompanying text; Appendix.

[42] CBA Article 6.4.3.3.

all "procedural" issues.[43]  Arbitrators will have the uniform guidance required to decide the threshold question whether a grievance claimed to be an Article 6.4.3.7 "matter of general application" covering multiple individuals is arbitrable.

Finally, we must address the trial court's conclusion that "the remedies sought by the Union in its demand for arbitration have the effect of rescinding evaluation judgments."  More specifically, said the court, "reinstating fired teachers, restoring all compensation and benefits, and purging any reference to the evaluation judgments from employment records" are remedies "tantamount to eliminating or rescinding the ratings themselves."  This statement is necessarily directed at CBA Article 15.3, which makes "compliance with the arbitration process, and not the evaluation judgment, . . . subject to the grievance and arbitration process."[44]  WTU did not seek to "purge any reference to the *evaluation judgments* from employment records"; rather, it sought to "purge . . . any references to DCPS's *wrongful termination of, or imposition of negative employment consequences* upon, the Grievant."[45]  That is to say, WTU sought remedies for alleged process violations while leaving the "evaluation judgments"

---

[43]  See *supra* note 19.

[44]  See *supra* note 9.

[45]  See *supra* note 15.

(or bad grades, in school parlence) on the books — a distinction emphasized by WTU and by this court in *WTU 1*.[46] With this much said, we leave remedies issues to arbitration.

## IV. Conclusion

In light of the foregoing analysis, we must affirm the trial court's permanent stay of the particular arbitration WTU seeks here. On the other hand, this affirmance is without prejudice. It does not preclude WTU from trying again to present a group grievance — or multiple group grievances — each circumscribed by the required "common injury." Furthermore, once another group grievance is presented for arbitration — now informed by the limitation to a common injury — nothing will preclude the arbitrator, after testing the grievance for such commonality, from dismissing the matter as inarbitrable or, if commonality is found, by dividing the matter into smaller groups for sake of efficiency in administering the arbitration.[47] Finally, all other issues raised by DCPS in this

---

[46] See *supra* note 9 and accompanying text.

[47] *Cf. In re* AMR Corp., No. 11-15463 (SHL), 2018 WL 2997104 (Bankr. S.D.N.Y. 2018) ("The process of conducting arbitrations with separate presentations from employee sub-groups is an accepted method of balancing competing employee interests.").

case, including (a) allegations that the CBA requires each teacher in the group to "consent" to arbitration; (b) WTU's alleged limitation of group grievants to the educators most adversely affected by procedural defects; and (c) the scope of relief, if any is granted, would all be for the arbitrator to decide, as each is a "procedural" matter.

*****

The judgment of the trial court is affirmed, without prejudice as explained.

*So ordered.*

## Appendix

WTU has claimed the following thirty-two violations of the IMPACT process:

1. Assignment of employee outside of area of certification;

2. Documentation not considered by evaluator in the IMPACT process;

3. Downgraded teacher's rating even though teacher was on official leave during rating period;

4. Evaluator's assessment/comments conflict with TLF rubric as outlined in IMPACT guidebook;

5. Evaluator's comments do not match score given;

6. Evaluator cut and pasted the same comments in multiple cycles and failed to consider teacher's contributions during last cycle of IMPACT;

7. Evaluator failed to consult/collaborate, seek input from the teacher regarding contributions during the IMPACT cycles;

8. Evaluator failed to consider contextual information about class, students, lesson or curricular model;

9. Evaluator failed to evaluate all aspects of teacher's performance;

10. Evaluator failed to follow IMPACT rubric for evaluating a specific type of class;

11. Evaluator failed to discuss TAS, CSC with teacher prior to evaluating teacher in these areas;

12. Evaluator failed to observe class for 30 minute duration;

13. Evaluator failed to provide a clear statement of expectations in the area of CSC;

14. Evaluator failed to review TAS student achievement results before assigning IMPACT score;

15. Evaluator falsified information on IMPACT evaluation;

16. Evaluator's final score was lower than what was promised/stated in post conference;

17. Evaluator rated teacher negatively for using DCPS curriculum;

18. Evaluator relied on other staff members' assessment versus relying on data, and/or consultation with teacher;

19 Evaluator wrote down things not observed during lesson;

20. Failed to provide support from an instructional coach;

21. Failed to provide plans for improvement, failed to provide cycles on IMPACT training and Common Core, differentiated job-embedded professional development and support;

22. Failure to evaluate consistent with TLF standards and other rubrics (CP, CSC);

23. Instructional Coach provided limited support and stopped providing assistance to teacher prior to end of six week cycle;

24. Misapplication/misrepresentation/miscalculation of CSC rubric, CP rubric, and TAS;

25. Misapplication/misrepresentation/miscalculation of School Based Social Work standard OSI-2;

26. Misapplication of leave, tardiness, CP, CSC and failure to consider teacher's contribution under CSC;

27. Multiple evaluators observed teacher on the same date and at the same time;

28. Placement of personnel in the wrong IMPACT group;

29. Post observation conference meeting not held and/or failed to hold on time;

30. TAS goals meeting not held;

31. Used arbitrary and capricious tactics in the IMPACT process;

32. Use of unreliable data, false statements, contradictory language.